United States Court of Appeals

Fifth Circuit

**F I L E D**

**December 9, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-40144

_____

OVIDIO MALACARA, <u>et al</u>.,

Plaintiffs,

OVIDIO MALACARA; DAVID RINCONES,

Plaintiffs-Appellants,

V.

RUSSELL GARBER, doing business as Garber Farms

Defendant-Appellee.

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before JOLLY and WIENER, Circuit Judges, and ROSENTHAL,[*] District
Judge.

ROSENTHAL, District Judge:

This appeal requires this court to examine the family business

exemption from the Migrant and Seasonal Agricultural Worker

Protection Act ("AWPA"), 29 U.S.C. §§ 1801 <u>et seq</u>. Appellants, two

Texas-based migrant farmworkers, alleged that appellee, the owner

---

[*]      District Judge of the Southern District of Texas, sitting
by designation.

of a family farm, deliberately discouraged them from accepting employment so he could import workers under a program that requires farmers first to attempt to hire American workers before receiving visas for foreign workers. Appellants alleged that appellee's conduct violated the AWPA and that his misrepresentations of the terms and conditions of employment at his farm constituted fraud under Texas law. The district court granted appellee's motion for summary judgment, dismissing the AWPA claim based on the family business exemption from the statute and dismissing the state law fraud claim based on a failure to raise a fact issue as to injury. We affirm the district court's grant of summary judgment.

## I. Background

Russell Garber and his wife own and operate a farm in Ohio. Beginning in 1999, Garber recruited migrant workers from Brazil, where he also owns a farming operation. Garber applied for visas for these farmworkers under the H-2A program administered by the United States Department of Labor ("DOL"). Under this program, the DOL grants foreign workers temporary work visas, but only if the employer first demonstrates that he has made a good faith, active attempt to recruit American workers but could not find sufficient able, willing, and qualified workers for his needs. 8 U.S.C. § 1188(a)(1)(A). When Garber sought H-2A visas for Brazilian workers in 2001, he submitted a report to the DOL stating that he had unsuccessfully attempted to find American migrant workers by word-

2

of-mouth spread through neighbors and acquaintances; by requesting help from the Farm Bureau, a local farm supply organization, and the Agricultural Extension Service, a statewide agricultural organization; and by filing a job order with the Ohio state employment services agency. Before agreeing to issue the visas, the DOL required Garber to publish job advertisements in Texas, which has traditionally been a source of farmworkers for Ohio, and to use the services of the Texas Workforce Commission ("TWC"). The advertisements told prospective workers interested in work opportunities at Garber's farm to contact the TWC. When prospective workers responded, the TWC relayed to them Garber's terms and conditions of employment. The TWC did not interview prospective applicants or make any job offers. Rather, the TWC served as a clearinghouse, where a prospective employer could post information about available work and prospective applicants could learn about the job opportunities.

Ovidio Malacara and David Rincones, both residents of McAllen, Texas, contacted the TWC after learning about job opportunities on Garber's farm through the Texas advertisements. Garber flew from Ohio to Texas to interview Malacara, Rincones, and several others who had contacted the TWC. Garber conducted the interviews in the TWC office. The TWC provided an interpreter for Malacara and others who spoke no English. Malacara and Rincones alleged that in the interviews, Garber tried to discourage them from taking a

job by misrepresenting the terms and conditions of the work. Malacara and Rincones claimed that Garber told them the work would be done in "cold snow" and offered to fly them to Ohio "in a manner that suggested Garber hoped they were afraid of flying." Rincones, who spoke only English, alleged that Garber warned that the inability to speak Spanish could be a problem in the workplace. Despite these alleged efforts at discouragement, Malacara and Rincones both expressed interest in taking the jobs. Garber promised to contact them shortly.

Garber responded that he accurately described the work at his farm during the interviews. Garber claimed that, in response to Rincones's inquiry about the language that would be spoken on the job and in the living quarters, he informed Rincones that he and his son – who spoke English – were "running the show" in the fields. Garber contended that Rincones obviously knew that Garber spoke English and should have assumed that Garber's son did as well. Garber told Rincones that he might be the only English-speaker in the living quarters. Garber asserted that he believed he had hired Rincones and Malacara at the interview; that Rincones had accepted; and that Malacara had not firmly accepted.

Garber telephoned Rincones to arrange his transportation to Ohio. Rincones alleged that during the telephone conversation, Garber emphasized the problem Rincones's inability to speak Spanish could present at the work site, as well as the safety risks of the

4

job. Garber alleged that he answered Rincones's prior question about the language spoken in the living quarters and notes that, during the telephone call, "there was some confusion over whether the statement by Garber about Rincones being the only English-speaking person related to the job or the living quarters." Rincones claimed that this conversation dissuaded him from traveling to Ohio to work for Garber. Rincones told Garber that he had reconsidered and would not be accepting employment with him.

Garber also telephoned Malacara. Malacara claimed that during this conversation, he understood only the words "bus ticket" and never communicated to Garber any lack of interest in coming to Ohio. Garber disputed this version of events, claiming that Malacara said that he had decided not to take the job in Ohio. Malacara asserted that when he did not hear from Garber again or receive a ticket for travel to Ohio, he "ultimately believed that Garber either had not really hired [him] at the interview, or that he had decided to reject [him] after the interview."

Malacara and Rincones sued Garber, alleging violations of the AWPA and the Immigration and Nationalities Act ("INA") and fraud under Texas law. After discovery, Garber moved for summary judgment on all three claims. The district court granted Garber's motion in its entirety. The court found that Garber fell under the family business exemption from the AWPA's requirements, available if a farmer's solicitation, recruitment, or furnishing of

5

farmworkers is performed solely by the farmer or by immediate family members. As to the second cause of action, the court found that the plaintiffs had no private right of action under the INA. As to the fraud claim, the court found that, in response to the summary judgment motion, Rincones had failed to present or point to evidence raising a fact issue as to whether he was damaged, an essential element of the fraud cause of action.

Malacara and Rincones appeal the district court's dismissal of the AWPA claims, and Rincones appeals the district court dismissal of his fraud claim.

## II. Analysis

This court reviews a district court's grant of summary judgment *de novo*, applying the same standards as the district court. BGHA, LLC v. City of Universal City, Tex., 340 F.3d 295, 297 (5th Cir. 2003). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); Worthy v. New Orleans S.S. Ass'n/Intern. Longshoreman's Ass'n, AFL-CIO Pension Plan, 342 F.3d 422, 426 (5th Cir. 2003). In deciding a summary judgment

6

motion, a court must review the facts drawing all reasonable inferences in the light most favorable to the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Cabillo v. Cavender Oldsmobile, Inc., 288 F.3d 721, 725 (5th Cir. 2002).

## A.    The AWPA and the Family Business Exemption

The AWPA is designed "to assure necessary protections for migrant and seasonal agricultural workers." 29 U.S.C. § 1801. The AWPA imposes requirements on labor contractors, agricultural employers, and agricultural associations. Farmers must disclose the terms and conditions of employment at the time of recruitment, § 1821(a); must make the disclosures in a language the worker will understand, § 1821(g); may not convey false or misleading information, § 1821(f); and must comply with the parties' work arrangements, § 1832(c). Malacara and Rincones alleged that Garber violated each of these provisions.

Family farmers who meet certain criteria are exempt from the statute. The AWPA provides:

> (a) The following persons are not subject to this chapter –
> (1) *Family business exemption*. – Any individual who engages in a farm labor contracting activity on behalf of a farm . . . which is owned or operated exclusively by such individual or an immediate family member of such individual, if such activities are performed only for such operation and exclusively by such individual or an immediate family member, but without regard to whether

7

such individual has incorporated or otherwise organized for business purposes.

29 U.S.C. § 1803(a)(1). The term "farm labor contracting activity" is defined as one of six types of acts: "recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(6). If a non-family member performs any labor contracting activity, that "spoils" an agricultural employer's claim to the exemption. Flores v. Rios, 36 F.3d 507, 510 (6th Cir. 1994).

It is undisputed that Garber and his wife are the sole owners of the Ohio farm and that Garber recruited workers exclusively for the family farm. The issue is whether Garber used non-family members to "recruit" farmworkers, so as to make Garber ineligible for the family farm exemption from the AWPA. Appellants contend that Garber's use of the state employment agencies to locate prospective employees and his use of friends and neighbors to spread information about job opportunities through word-of-mouth makes him ineligible for the family business exemption. Garber responds that neither his use of the state agencies nor of friends or neighbors makes him ineligible for the exemption, arguing that he did not delegate to others any of the farm labor contracting activities set out in the statute.

One appellate court has considered whether a farmer's use of a state employment service to help locate prospective workers makes that farmer ineligible for the family business exemption. In

8

Flores, a tomato farmer located in Ohio hired Texas farmworkers referred by the Ohio Bureau of Employment Services ("OBES").  36 F.3d at 512.  The defendant's "interactions with OBES [we]re a two-way street."  Id.  Administrators from the OBES would contact the defendant in an effort to place particular workers, and the defendant would contact the OBES to post job listings.  Id.  The court held that this use of the state agency did not defeat the family business exemption because the agency did not conduct "contracting activity" under the AWPA.  Id. at 513.  The court explained that all the "practices listed by Congress as examples of farm labor contracting activity are distinctly *contractual* in nature" and that the statutory language of the AWPA exemption could not be defined "without regard for the contractual context in which the exemption applies."  Id.

The Flores court relied on Calderon v. Witvoet, 999 F.2d 1101 (7th Cir. 1993), which emphasized the context in which "farm labor contracting activities" are defined:

> This definition collects a number of contractual endeavors: making a contract of employment ("hiring"), maintaining a worker in the labor force ("employing"), preparing to do these things ("recruiting" and "soliciting"), and doing them for others ("furnishing").  The final term in this sequence, "transporting", can be understood as still another contractual activity: obtaining and paying for a ticket that brings the worker to the farm or sends him to the next one.

9

<u>Flores</u>, 36 F.3d at 513 (quoting <u>Calderon</u>, 999 F.2d at 1103-04) (finding that defendants were entitled to the AWPA exemption despite the fact that non-family members drove farm bus, trucks, and cars). The <u>Flores</u> court explained that the OBES is a state agency that "merely provides the worker with a chance to find a job at a farm in need of labor." <u>Id</u>. Noting that the agency's activities were gratuitous; the agency represented neither the employee nor the employer; and the employer alone had the power to hire workers, the <u>Flores</u> court held that the agency did not recruit, solicit, or furnish workers within the meaning of the AWPA. <u>Id.</u> The farmer's use of the agency did not make him ineligible for the family business exemption. <u>Id</u>.

Malacara and Rincones do not argue that the TWC performed services materially different from the OBES. In this case, as in <u>Flores</u>, the state agency told workers of job opportunities and identified interested workers to prospective employers. Neither the OBES in <u>Flores</u> nor the TWC in this case made job offers. Rather, Malacara and Rincones contend that <u>Flores</u> is incorrectly decided. They contend that under the AWPA, such a use of a state agency to look for workers forfeits the family business exemption.

Garber responds that no case has disagreed with <u>Flores</u> in the years since it issued. Garber emphasizes that the position appellants advocate would create a Hobson's choice for a farmer who chooses to avail himself of the H-2A visa program and otherwise

10

qualifies for the family business exemption from the AWPA. Under the H-2A visa program, the DOL requires farmers to use state employment agencies to locate domestic workers before allowing visas to issue to foreign workers. Malacara and Rincones argue that surrender of the family farm exemption should be viewed as "a price of admission into the H-2 and H-2A programs," requiring a farmer to choose between the family business exemption under the AWPA and the opportunity to hire foreign workers under the H-2A visa program.

The definition of "farm labor contracting activities" under the AWPA adopted in <u>Flores</u> and <u>Calderon</u> is consistent with the statute's language and structure. The approach that Malacara and Rincones advocate would"divorc[e]" the statutory term "from its context." <u>Calderon</u>, 999 F.2d at 1104. In drafting the AWPA, Congress defined recruiting, soliciting, hiring, employing, furnishing, and transporting within the scope of contracting activities. It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." <u>Deal v. U.S.</u>, 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993); <u>see also</u> <u>Flores</u>, 36 F.3d at 513 ("Laws cannot be interpreted by snatching single words out of statutory sentences and matching these words – without regard for

11

context – up against one of the many definitions of that word found in the advocate's dictionary of choice.").[1]

The record is undisputed that Garber did not use state job agencies to recruit "in any contractual sense." Flores, 36 F.3d at 513. Like the OBES in Flores, the state employment agencies that Garber used charged no fee for their services and did not purport to represent either the employer or employee. Both Garber and the workers remained free at all times to accept or reject any agency recommendation. An agency referral provided the worker with no assurance of employment. Garber did not delegate any authority to hire to the TWC, but rather flew to Texas personally to interview applicants. No one at the state employment offices offered a job to applicants; instead, Garber personally extended job offers to them. Garber did not delegate statutory contracting activities to the TWC or other state agencies.

Malacara and Rincones rely on a DOL opinion letter stating that the use of a state employment service agency to locate workers vitiates the family business exemption. They argue that the letter

---

[1] Malacara and Rincones cite the repealed Farm Labor Contractor Registration Act ("FLCRA"), 7 U.S.C. §§ 2041 et seq., the AWPA's predecessor statute, and this court's decision in Montelongo v. Meese, 803 F.2d 1341 (5th Cir. 1986), to support their argument. Appellants' citations to the FLCRA and Montelongo v. Meese are unhelpful. The FLCRA has been repealed. In Montelongo, which held that a person was "recruiting" on behalf of a farmer where that person told workers about potential employment and referred them to the farm where they were summarily accepted upon arrival, the court construed language under the FLCRA. 803 F.2d at 1346.

is entitled to deference under <u>Skidmore v. Swift & Co.</u>, 323 U.S.134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).[2] In the opinion letter, issued on April 14, 1994, the DOL asserted that the family business exemption "by its plain terms, does not apply to any business or person using the services of a state employment service agency to obtain workers." Interpretations contained in opinion letters are not controlling and should be followed only insofar as they have "power to persuade." <u>Christensen v. Harris County</u>, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); <u>Moore v. Hannon Food Serv., Inc.</u>, 317 F.3d 489, 497 (5th Cir. 2003); <u>see also</u> <u>Salinas v. Rodriquez</u>, 963 F.2d 791, 793 (5th Cir. 1992). The DOL opinion letter is not persuasive. That letter was based "upon a reexamination of the legislative history, the statute, the regulations issued thereunder, and recent judicial interpretations concerning the intent of Congress." Significantly, the letter was issued before the Sixth Circuit's ruling in <u>Flores</u> and cited "recent judicial interpretations" that were rejected in <u>Flores</u>. The basis of the DOL opinion letter is no longer valid after <u>Flores</u>. Indeed, if the DOL were to prevail on both (1) its requirement that farmers work through state agencies and (2) the position espoused in its opinion letter, the DOL would, in effect,

---

[2] <u>Skidmore</u> requires a court to accord deference to an administrative judgment, "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140.

13

be repealing the family farm exemption – a power enjoyed exclusively by Congress and not available to an executive branch department.

Malacara and Rincones argue that the family business exemption should be construed narrowly because Congress intended the AWPA to be remedial in nature. See H.R.Rep. No. 885, at 12, U.S.CODE CONG. AND ADMIN. NEWS 1982 at 4558 ("The Committee intends that the foregoing exemptions be construed narrowly in a manner that furthers the remedial purposes of this Act."); see also Bracamontes v. Weyerhaeuser Co., 840 F.2d 271, 276 (5th Cir. 1988); Charles v. Burton, 169 F.3d 1322, 1334 (11th Cir. 1999) (". . . since the AWPA is a remedial statute, we must construe it broadly."), r'hrg denied, 182 F.3d 938 (11th Cir. 1999), cert. denied, Burton v. Charles, 528 U.S. 879, 120 S.Ct. 191, 145 L.Ed.2d 160 (U.S. 1999); Flores, 36 F.3d at 510. They argue that, in enacting the AWPA in 1983 and in amending the INA and the AWPA in 1986, Congress implicitly endorsed the result that farmers who use the H-2 and H-2A programs could not qualify for the AWPA's family business exemption. The court in Flores rejected a similar argument, finding that courts must not "obliterate" or "eviscerate" the family farm exemption for farmers who use public employment services. See Flores, 36 F.3d at 510. Accepting Malacara's and Rincones's proposition would exclude family farmers from the H-2A program unless they relinquish the protection Congress specifically

14

granted under the AWPA. A family farmer's compliance with the mechanism Congress devised to promote the employment of American workers under the H-2A program would undermine the exemption carved out from the AWPA to protect family farmers. "Congress has embraced a federal policy designed to benefit the oft-beleaguered family farmer." Id. "Federal laws are shot through with favorable rules for small businesses and family farms." Calderon, 999 F.2d at 1105.

The use of state employment agencies to bring workers interested in out-of-state jobs together with family farmers, including those farmers considering using foreign workers, supports, rather than frustrates, the remedial goals of the AWPA. "Mindful of AWPA's protective goals, we see no reason to deter family farmers from using the public employment service when the challenged practice poses no threat to workers . . . . In fact, the government's presence in the labor market can only serve to protect workers like [the plaintiff]. The effectiveness of the public employment service directly reduces the workers' need to rely on potentially-abusive crew leaders to find agricultural employment." Flores, 36 F.3d at 513. The AWPA and the H-2A program can effectively coincide to promote the dual interests of protecting family farmers from burdensome litigation while expanding the potential labor market for American workers.

15

Malacara and Rincones also argue that Garber lost the family business exemption by using neighbors to spread news of job opportunities through word-of-mouth. The evidence they present to substantiate this claim is Garber's statement in his application for H-2A visas that he "advertised by word of mouth." The record reveals that in "word-of-mouth referrals," Garber told "neighbors, acquaintances, and so on" that "I need help." Neither the record nor the parties' briefs indicate a more extensive use of any non-family "recruiters."

In Calderon, the laborers' oral reports of their experiences in the defendant's farm allegedly led other migrant workers to work for the defendant. The Seventh Circuit held that unsolicited remarks by existing workers to their friends and family that led to additional job applications would not defeat the family farm exemption. 999 F.2d at 1105. "What workers tell their friends is beyond the owners' control, and treating such activities as 'farm labor contracting activities' would gut the exemption – for it is impossible to suppress word-of-mouth reports about the job." Id. By contrast, the Sixth Circuit in Flores found that the defendant's word-of-mouth activity did defeat his family farm exemption. In Flores, an employee of the tomato farmer recommended a worker to the farmer. 36 F.3d at 515. The employee, not the farmer, extended the worker a job offer and instructed him to move his family from Texas to Ohio. Id. The farmer never talked to the

16

worker during this process. Id. The Flores court explained that, while "an employee's 'gratuitous recommendation' . . . ha[s] no effect on the farmer's eligibility for the exemption," a farmer's "specific delegation of recruiting authority to an employee . . ." defeats the exemption. Id. The court explained that the defendant's employee was "solely responsible" for conveying the offer of employment to the plaintiff and encouraging the plaintiff and his family to move to the defendant's farm to begin work. Id. The farmer's minimal involvement in the hiring decision showed that the farmer had delegated hiring authority to his employee. Id. at 516. "If the [farmers] wish to remain exempt, they are fully empowered to do so – by speaking directly to the employee they are hiring." Id.

Malacara and Rincones argue that the touchstone for deciding whether a farmer is responsible for the activities of non-family intermediaries under the AWPA should be intentionality. They cite Calderon for the proposition that the "focus" should be on the farmer's "own decisions and actions – including the choice, if [he] made one, to delegate" farm labor contracting activities to a non-family member. 999 F.2d at 1105. They contend that Flores illustrates intentionality by evaluating the farmer's "own decisions and actions." 36 F.3d at 515. The Seventh Circuit in Calderon held that the focus is on whether the farmer had in fact delegated recruitment and hiring authority. 999 F.2d at 1105. In

17

<u>Flores</u>, the Sixth Circuit emphasized the evidence of the delegation of hiring authority, noting "the lack of *any* direct contact between the employer and the migrant worker, that cost [the defendant] its exemption." 36 F.3d at 516.

The record does not indicate that Garber delegated recruiting or hiring authority. Garber himself extended the job offers to applicants, only after personally interviewing them. Without evidence that Garber ceded any control over recruiting or hiring to friends or neighbors, or even that they referred any workers to him, the record shows no delegation of recruiting authority that would defeat the AWPA exemption. To the contrary, the record reveals that Garber took pains to maintain his AWPA exemption. After the DOL required him to use the TWC to try to locate workers in Texas, Garber traveled to Texas to meet with interested applicants, interviewed them himself, and made the job offers himself. This record defeats an inference of delegation.

Malacara and Rincones contend that Garber failed to meet the burden of proving entitlement to the family business exemption, an affirmative defense. A party asserting an affirmative defense "must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his favor." <u>Chaplin v. NationsCredit Corp.</u>, 307 F.3d 368, 372 (5th Cir. 2002) (quoting <u>Fontenot v. Upjohn Co.</u>, 780 F.2d 1190, 1194 (5th Cir. 1986)). The record evidence as to Garber's employment activities is undisputed.

18

The contested issue is whether Garber is entitled to the family business exemption, given the limited involvement of non-family third parties. This court holds that because the undisputed evidence shows that the third parties performed no farm labor contracting activities under the AWPA, summary judgment that Garber qualified for the family business exemption was proper.

**B.   The Fraud Claim**

Under Texas law, the elements of a fraud cause of action are: (1) a material representation; (2) it was false when made; (3) the speaker either knew it was false or asserted it without knowledge of its truth; (4) the speaker intended that it be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result. Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 322 (5th Cir. 2002); Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998). Garber moved for summary judgment, stating in his motion that Rincones had failed to show evidence of any of the fraud elements, including injury. In his response to the summary judgment motion, Rincones did not address this argument or point to evidence of injury. The district court granted Garber's summary judgment motion, finding that Rincones had failed to point to any record evidence showing that Garber's alleged fraud caused Rincones any injury.

19

Rincones contends that the district court improperly entered summary judgment "sua sponte." He notes that Garber's summary judgment motion focused on whether Garber had made misrepresentations and whether Rincones had reasonably relied on them. Rincones argues that the district court should have at least notified him that it intended to consider the lack of evidence of injury as a ground for summary judgment. Citing Nowlin v. Resolution Trust Corp., 33 F.3d 498, 504 (5th Cir. 1994), Rincones contends that a district court must provide the plaintiff a minimum of ten days notice before granting summary judgment "sua sponte."

Garber responds that a district court has an inherent "power to enter summary judgments 'sua sponte,' so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex, 477 U.S. at 326. Garber argues that his motion for summary judgment placed Rincones on notice that Garber contended the record could not support any of the elements of his fraud claim.

Garber's motion for summary judgment did put Rincones on notice that he needed to point to or submit evidence as to each element of the fraud cause of action. The motion listed the six elements of a fraud cause of action under Texas law and argued that Garber was entitled to summary judgment "[b]ecause Plaintiffs cannot prove any of these elements much less all of them." Nowlin does not state that notice is provided only when a movant

20

specifically identifies the absence of evidence as to an element of the cause of action, but rather holds that adequate notice exists when the losing party is aware "that [he] had to come forward with all of [his] evidence." 33 F.3d at 504 n. 9 (quoting Celotex, 477 U.S. at 326; Judwin Props., Inc., v. U.S. Fire Ins. Co., 973 F.2d 432, 436-37 (5th Cir. 1992)). A movant's burden is to point out the absence of evidence supporting the nonmovant's case. Celotex, 477 U.S. at 323; Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996). To survive summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action. Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 349 (5th Cir. 2001); Fontenot, 780 F.2d at 1195. The district court judge did not grant summary judgment "sua sponte" or with inadequate notice to Rincones.

Rincones further contends that the record contained sufficient evidence of injury to preclude summary dismissal of the fraud claim. He states that evidence in the record showed that Garber's contract with Rincones would have been worth $10,193.40 in wages plus free housing, while he earned only $3,710.78, with no housing, from the job he obtained in lieu of employment with Garber. This evidence was in Rincones's deposition, the transcript of which Garber submitted as an exhibit to the district court. Rincones did not, however, mention this evidence in his brief.

21

When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court.  See Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 916 (5th Cir. 1992), *cert.* *denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  Ragas, 136 F.3d at 458; Stults, 76 F.3d at 657; Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994), cert. denied, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); Skotak, 953 F.2d at 916 n. 7; see also Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); cf. U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  Because Rincones did not identify any evidence of damages in his summary judgment response, the evidence was not properly before the district court and will not be considered here.[3]

---

[3]  Appellants initially argued that the district court failed to credit their evidence of damages, but conceded in their reply brief that "after re-reviewing the law, [they] agree with the Appellee that, post-Celotex, a district court need review only those portions of the record called to the court's attention by the

22

This court affirms the district court's grant of summary judgment on the fraud claim.

### III. Conclusion

The district court correctly granted summary judgment to Garber on the AWPA claims by finding that he qualified for the family farm exemption and correctly granted summary judgment against Rincones on his fraud claim. The judgment below is AFFIRMED.

---

parties, and not the entire record, before granting summary judgment."