# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 28, 2016

Lyle W. Cayce
Clerk

No. 15-20629

United States of America, State of California, State of Delaware, District of Columbia, State of Florida, State of Georgia, State of Hawaii, State of Illinois, State of Indiana, State of Louisiana, Commonwealth of Massachusetts, State of Michigan, State of Montana, State of Nevada, State of New Hampshire, State of New Jersey, State of New Mexico, State of New York, State of Oklahoma, State of Rhode Island, State of Tennessee, State of Texas, Commonwealth of Virginia, ex rel, SUSAN RUSCHER, qui tam relator,

      Plaintiff - Appellant

v.

OMNICARE, INCORPORATED; ACCU-MED SERVICES, L.L.C.; ACCU-MED SERVICES OF WASHINGTON, L.L.C.; ACCU-MED, INCORPORATED; OMNICARE PHARMACY OF TEXAS 2, L.P.; OMNICARE PHARMACY OF FLORIDA, L.P.; ARLINGTON ACQUISITION I, INCORPORATED; ASCO HEALTHCARE, L.L.C.; BADGER ACQUISITION OF TAMPA, L.L.C., doing business as Bay Pharmacy; DR PHARMACARE, doing business as Omnicare of Louisville, Kentucky, doing business as Omnicare of Lexington, Kentucky; NCS HEALTHCARE OF MICHIGAN, INCORPORATED; NCS HEALTHCARE OF MINNESOTA, INCORPORATED; NCS HEALTHCARE OF MISSOURI, INCORPORATED; NCS HEALTHCARE OF NEW HAMPSHIRE, INCORPORATED; NCS HEALTHCARE OF NORTH CAROLINA, INCORPORATED,

      Defendants - Appellees

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-3396

No. 15-20629

Before JOLLY, HAYNES, and GRAVES, Circuit Judges.

PER CURIAM:*

Susan Ruscher ("Relator") appeals the district court's grant of summary judgment to Omnicare, Inc., on her False Claims Act ("FCA") claims and analogous state law claims (collectively, "FCA claims") and her Reverse False Claims Act ("Reverse FCA") claim, and denial of four discovery motions. For the reasons explained below, we AFFIRM.

## I. Background

Omnicare is the nation's largest provider of pharmacy services to long-term care facilities. It specializes in servicing geriatric patients living in nursing homes, referred to formally as skilled nursing facilities ("SNFs"), among other long-term care institutions. SNFs provide around-the-clock medical, nursing, and therapy services to residents, who usually have their pharmacy and drug costs reimbursed by Medicare Part A ("Part A"), Medicare Part D ("Part D"), or Medicaid.

Part A benefits last for 100 days. To collect drug costs covered by Part A, Omnicare bills the SNFs. SNFs are compensated for Part A costs under a prospective system, whereby SNFs are paid a per diem amount for each Part A resident to cover the costs associated with caring for the resident, including pharmacy services. The per diem amount is based on the historical costs reported by all SNFs, and this amount may or may not cover all of the patient's expenses. To track allowable costs and determine per diem amounts, SNFs are required to submit annual cost reports identifying the costs incurred for a given reporting period, including costs that have yet to be paid. SNFs have one year following the end of the cost reporting period in which liability is

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

incurred to pay providers, such as Omnicare.  If providers are not paid within one year and the payment period is not extended under an exception, then SNFs must amend their cost reports through a "worksheet A-8 adjustment." Once Part A benefits are exhausted, Part D and Medicaid benefits begin covering the drug costs incurred by covered patients.

Omnicare grew rapidly in the early 2000s by acquiring a series of long-term care pharmacies.  From 2002 to 2005, Omnicare nearly doubled in size. Many of the new pharmacies, however, used disparate billing systems, some of which failed to closely track and record payments to invoices.  The SNFs involved in this lawsuit began actively auditing their Omnicare bills to identify erroneous charges, and these disputes sometimes took years to resolve.

Relator worked in Omnicare's collections department from July 2005 until August 2008, collecting past-due accounts receivables from SNFs. According to the parties, Omnicare and SNFs routinely entered into preferred provider agreements, which designated Omnicare as the SNFs' preferred provider of pharmacy services and set forth, among other things, pricing, payment terms, and billing mechanisms.  Relator became suspicious of Omnicare's contract negotiations with clients owing past-due accounts receivables and expressed her concerns about potential Medicare fraud to superiors.  She claims that her "resistance" to Omnicare's contract negotiations eventually led to her termination.

Relator filed a *qui tam* action on behalf of the United States and twenty-two states against Omnicare and its affiliates,[1] alleging that Omnicare violated the FCA and twenty-two analogous state statutes by purportedly making, and causing SNFs to make, false claims for Medicare and Medicaid

---

[1] Relator also included the SNFs as defendants in her original complaint but later dismissed them from the lawsuit.

reimbursements that allegedly resulted from kickbacks in violation of the Anti-Kickback Statute ("AKS").[2]  Relator also brought a claim under the Reverse FCA, alleging that Omnicare violated an obligation to disclose a "reportable event" of Medicare fraud to the Office of the Inspector General for the Department of Health and Human Services ("OIG-HHS") pursuant to a 2006 Corporate Integrity Agreement ("CIA").[3]  The district court limited the relevant time period for the FCA claims to those arising out of alleged kickbacks paid between January 1, 2005, and December 31, 2008.  The United States and the twenty-two state governments declined to intervene.

The district court granted summary judgment to Omnicare and dismissed all of Relator's claims.  Relator timely appealed.

## II.  Standard of Review

This court reviews "an order granting summary judgment *de novo*, applying the same standard as the district court."  *Cooley v. Hous. Auth. of City of Slidell*, 747 F.3d 295, 297 (5th Cir. 2014).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A disputed fact is material if it has the potential to "affect the outcome of the suit under the governing law."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A district court's discovery decisions are reviewed for an abuse of discretion.  *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 876 (5th Cir. 2000).

---

[2] "The AKS provides no private right of action; therefore, a private plaintiff may not sue a health care provider under the AKS alone."  *United States ex rel. Nunally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 n.5 (5th Cir. 2013) (citing 42 U.S.C. § 1320a–7b(b)(1–2)); *see also Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 522 (11th Cir. 2015) (noting that the AKS does not provide a private right of action).

[3] Relator also alleged a "False Records or Statements" claim and a "Conspiracy" claim under the FCA, but does not challenge the dismissal of those claims on appeal.

## III.  Discussion

### A. Discovery Motions

Relator claims that she was deprived of the necessary discovery to support her claims; she alleges that the district court abused its discretion when it denied relief on four separate discovery motions:  (1) a motion to compel Omnicare to produce all documents regarding potential CIA violations; (2) a motion to "reopen the 30(b)(6) deposition" due to too many objections from Omnicare in the original deposition; (3) a motion for leave to depose Omnicare's former Chief Compliance Officer, who headed an internal committee responsible for CIA compliance; and (4) a motion seeking *in camera* review of Omnicare's privilege log because a transcript from a prior Omnicare case indicated Omnicare may have improperly asserted privilege in the present case ("Privilege Log Motion").

A district court's discovery decisions are reviewed for abuse of discretion, and this court "will affirm such decisions unless they are arbitrary or clearly unreasonable." *Moore*, 233 F.3d at 876.  We have held that there was "nothing arbitrary or unreasonable" about denying a discovery motion for additional discovery when the lawsuit was pending for fourteen months before summary judgment, and the plaintiffs made a conclusory argument that "they should have been allowed to 'fully explore the Defendants' conduct . . . by taking their depositions,' but d[id] not state what relevant evidence they expected to uncover with additional discovery."  *Id.*; *see also United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 233 (5th Cir. 2008) (similar).

Relator argues that the district court's denial of her discovery motions seeking evidence "central to her claims" constitutes reversible error.  But she fails to "state what relevant evidence [she] expected to uncover with additional discovery."  *See Moore*, 233 F.3d at 876.  Instead, her arguments as to the first three motions amount to conclusory assertions that she "should have been

allowed to 'fully explore [Omnicare's] conduct.'" *See id.* Relator also failed to show that the district court abused its discretion in rejecting her claims of Omnicare's non-compliance with discovery obligations. She instead offered evidence demonstrating, at most, a difference of opinion with the district court. Relator's case was pending for more than seven years before summary judgment; absent evidence showing what she expected to uncover with additional discovery, it was neither arbitrary nor unreasonable for the district court to deny Relator's discovery motions. *See id.*

As to the Privilege Log Motion, the district court declined to order *in camera* review based on conduct in another Omnicare case because there was not enough information about the other case to infer misconduct in the present case. The district court's order also reveals that "Relator identified only seven individual documents that she believed may have been improperly withheld as privileged," and Omnicare promptly determined that two of the seven documents were not privileged and gave those documents to Relator. Omnicare explained the basis of privilege for the remaining five documents, "and Relator [did] not challenged those explanations." The district court refused to infer improper conduct from the two wrongly withheld emails because "even a careful privilege review could misclassify some documents." The record does not reflect arbitrary or clearly unreasonable decision making. Accordingly, we hold that the district court did not abuse its discretion in denying these motions. We thus turn to the merits of the summary judgment rulings.

## B. FCA Claims

The FCA imposes civil liability and treble damages on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A); *see also United States ex rel. Steury v. Cardinal Health, Inc.*,

625 F.3d 262, 267 (5th Cir. 2010).  We have required plaintiffs to prove four elements to prevail on an FCA claim: "(1) . . . there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."  *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quotation marks omitted).

FCA claims can be either legally false or factually false.  *E.g.*, *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (recognizing factually false claims as "the paradigmatic case" and legally false claims as the "certification theory").  A claim is factually false when the information provided to the government for reimbursement is inaccurate.  *See, e.g.*, *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008).  A claim is legally false when "a claimant . . . falsely certifies compliance with [a] statute or regulation."  *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).

Here, Relator primarily argues that Omnicare made legally false Medicare and Medicaid claims.  She contends that Omnicare knowingly made, or caused SNFs to make, false certifications of compliance with the AKS when submitting claims for reimbursement.  For the alleged Part A claims, however, Relator also contends that Omnicare caused the SNFs to submit factually false claims.  In support of this contention, she points to evidence purportedly showing that the SNFs failed to accurately report drug costs on Part A cost reports.

As to her claim that Omnicare falsely certified compliance with the AKS, Relator bears the burden at the summary judgment stage to create a genuine issue of material fact about whether Omnicare violated the AKS.  *See Malacara*

*v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003) ("To survive summary judgment, the nonmovant must submit or identify evidence in the record to show the existence of a genuine issue of material fact as to each element of the cause of action."). To this end, Relator primarily contends that Omnicare paid unlawful kickbacks to SNFs by both not collecting Part A debt and offering prompt payment discounts ("PPDs") "to induce the SNFs to refer patients to Omnicare who were covered under Part D and Medicaid."[4]

The AKS prohibits the following conduct:

> knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2)(A). "This statute criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). Relator need only show that one purpose of the remuneration was to induce such referrals. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). There is no AKS

---

[4] Relator's other arguments are too speculative to create a fact issue as to Omnicare's intent. *Simmons v. Willcox*, 911 F.2d 1077, 1082 (5th Cir. 1990) ("[S]peculative allegations . . . are insufficient to create a genuine issue of material fact precluding summary judgment."). For example, Relator claims that Omnicare's intent to induce referrals can be inferred from evidence of negotiations for pharmacy acquisitions occurring simultaneously with negotiations over provider agreements, and evidence of large accounts receivables occurring simultaneously with an SNF's purchase of new facilities. But Relator provides no evidence linking these disparate activities and circumstances. Absent such evidence, Relator's arguments amount to mere speculation and are therefore insufficient to create a genuine issue of material fact as to Omnicare's intent.

violation, however, where the defendant merely hopes or expects referrals from benefits that were designed wholly for other purposes. *E.g.*, *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000). Accordingly, the OIG-HHS explained in comments to the AKS's safe harbor provision that PPDs were not included among the safe harbors because "by definition, [PPDs] are designed to induce prompt payment, and thus do not appear to violate the statute." *Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions,* 56 Fed. Reg. 35952, 35979 (July 29, 1991).

Here, Relator's evidence regarding Omnicare's treatment of SNFs' Part A debt does not support a finding that Omnicare offered benefits to SNFs that were designed to induce Medicare and Medicaid referrals. Relator's evidence primarily shows Omnicare trying to collect verifiable debt and settle billing disputes without unnecessarily aggravating SNF clients in the midst of ongoing or anticipated contract negotiations. At best, the evidence supports a finding that Omnicare did not want unresolved settlement negotiations to negatively impact its contract negotiations with SNF clients and was, likewise, avoiding confrontational collection practices that might discourage SNFs from continuing to do business with Omnicare.[5] None of the evidence, however,

---

[5] For example, Omnicare's email about an SNF named Shoreline shows that resolving billing disputes between Omnicare and Shoreline was difficult, and failing to resolve the dispute "ha[d] the potential to derail [Omnicare's] efforts to secure the [Shoreline] business." Another email shows that Omnicare wanted to continue negotiating an acceptable payment plan for a delinquent Shoreline facility rather than "immediately" cutting off services to that facility because of its relationship to the larger Shoreline business and the ongoing negotiations for a new provider agreement with Shoreline. Similarly, an email about an SNF named Five Star shows that Omnicare adjusted its collection practices for "extremely old balances" but continued normal collection practices for immediate balances because it did not want the "extremely old balances that are in dispute" to become a "source of division." In another instance, with an SNF named Harborside, Omnicare decided not to issue a demand letter on a delinquent account because it did not want to "introduce an irritant that might impede progress on picking up [Harborside's] newly acquired KY facilities." Instead, it opted to wait another month before addressing the issue with Harborside because Omnicare already had a meeting scheduled with Harborside that next month.

shows that Omnicare designed its settlement negotiations and debt collection practices to induce SNF clients to continue making Medicare and Medicaid referrals to Omnicare.[6] Indeed, there is no evidence that the SNFs were told they were getting special benefits from Omnicare's settlement negotiations and debt collection practices, let alone that any such benefits were tied to Medicare and Medicaid referrals.[7] If the purported benefits were designed to encourage SNFs to refer Medicare and Medicaid patients to Omnicare, one might expect to find evidence showing that the SNFs at least knew about those benefits. Although Omnicare may have hoped for Medicare and Medicaid referrals, absent any evidence that Omnicare designed its settlement negotiations and debt collection practices to induce such referrals, Relator cannot show an AKS violation.

Similarly, the PPDs offered by Omnicare did not violate the AKS because there is no evidence that they were designed to induce referrals. Much of Relator's evidence simply shows that PPDs were offered in contract

---

[6] The closest question involves a two-year contract for monthly credit payments between Omnicare and Harborside. Relator argues that a March 2004 email shows that there was a billing dispute between Omnicare and Harborside, and that Omnicare wanted to resolve the dispute by offering monthly credits against Harborside's future bills contingent upon a multi-year contract renewal. Omnicare and Harborside ultimately entered into a two-year provider agreement, effective October 1, 2004, whereby Omnicare promised to pay Harborside $37,500 in monthly credits for a maximum of twenty-four months. Even if we were to assume arguendo that this evidence shows that Omnicare designed its promise of monthly credit payments to induce a multi-year contract for future referrals, the alleged inducement occurred in 2004, which is outside the relevant time period for this litigation. Moreover, Relator points to no evidence showing how the agreement was carried out, if at all, during the relevant time period. Accordingly, this evidence does not support an AKS violation during the relevant time period and thus cannot support her FCA claims in this litigation.

[7] Relator also points to an email that says that settling billing disputes might give Omnicare the "'goodwill' necessary to receive serious consideration for the Seacrest business." This comment alone, without more, is not enough to show that Omnicare *designed* its negotiations to encourage Medicare and Medicaid referrals. It does not indicate, for example, that Omnicare planned to offer special benefits to produce this result, or that Seacrest believed Omnicare was offering special benefits.

negotiations and included in new contracts.  But these documents fail to show that the PPDs were offered for the illegitimate purpose of inducing referrals rather than the legitimate purpose of inducing payments.  *See Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions,* 56 Fed. Reg. at 35979.  Moreover, where PPDs were taken despite late payment, there was either additional consideration provided in the form of prompt payment of past-due accounts receivables or billing disputes that prevented SNFs from making prompt payments.  Relator cannot survive summary judgment on this record.

Relator also claims that Omnicare caused one SNF to submit factually false Part A cost reports because it did not pay for the reported costs within one year following the end of the reporting period.  As Relator's expert explained, all reported costs must be paid "within 1 year after the end of the cost reporting period in which the liability is incurred."  Relator provided evidence that one of the SNFs filed a cost report reflecting $30,191 in drug expenses for the reporting period of November 1 to December 31, 2007, but paid nothing to Omnicare during that period.  She argues that a September 2008 Omnicare aging report showing that this SNF "owed $228,774.17 past due by 271+ days" proves that it never paid the drug expenses within one year after the cost reporting period ended.

Relator's evidence does not support her argument.  The SNF had until the end of 2008 to pay the $30,191 in drug expenses because the reporting period for those expenses ended on December 31, 2007.  But Relator's evidence only shows past-due accounts receivable through September 2008.  It does not address the remaining three months of the 2008 calendar year, and thus does not show whether the SNF paid the drug expense before the end of the year.  Relator provides no additional evidence in support of this claim.  We therefore agree with the district court that Relator's claim cannot survive summary

judgment because her evidence fails to support a finding that the drug costs were not paid within the legally authorized time period.

Relator additionally argues that evidence showing pre-2006, past-due accounts receivables also supports her factual falsity claim.  This evidence, however, merely shows a settlement agreement regarding allegations that Omnicare overcharged an SNF for pharmacy services.  It does not show that the SNF filed cost reports on the disputed overcharges.  Even if it did, the evidence would still fail to support Relator's factual falsity claim because it does not show that the SNF failed to file a worksheet A-8 adjustment after the one-year payment period ended.  Accordingly, this evidence also fails to support a finding that the cost reports were factually false.

For the foregoing reasons, we affirm the district court's dismissal of Relator's FCA claims.

### C. Reverse FCA Claim

The Reverse FCA imposes liability on "any person who . . .  knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 652–53 (5th Cir. 2004) (quoting 31 U.S.C. § 3729(a)(7)).  "In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." *Id.* at 653.

Under Omnicare's 2006 CIA with the OIG-HHS, Omnicare was required to disclose to the OIG-HHS in writing any "reportable events," and then summarize such events in an annual report at the end of every reporting period.  Reportable events include any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program."

Relator claims that her December 2007 email alleging that one of Omnicare's customers was committing Medicare fraud constituted a "reportable event" under the CIA. Accordingly, the argument continues, Omnicare's failure to disclose this "reportable event" in its annual report to the OIG-HHS made the report a false record used to conceal an obligation to pay money to the government.

The email Relator relies on relates to purported fraudulent Part A cost reports. Relator's email, however, does not show a probable violation of federal health care laws. It says, in relevant part, that customers with past-due accounts receivables will be committing Medicare fraud if Omnicare forgives their debt because "[t]hey have been reimbursed a[n]d they need to pay." But cost reports use accrual-based accounting, which requires the participant to report costs incurred during the reporting period, regardless of when payment occurs. If costs are not liquidated within one year and the payment period is not extended under an exception, then an amended cost report should be filed through a worksheet A-8 adjustment. Thus, even assuming that the Part A debt was never paid, there is still no "probable violation" of the Part A health care program unless Relator had information to believe that the customer in question would not be submitting a worksheet A-8 adjustment to reflect changes made to its reported Part A costs. The email does not indicate Relator had this information, and Relator provides no evidence indicating otherwise. We therefore affirm the district court on the Reverse FCA claim.

For the foregoing reasons, we AFFIRM the summary judgment, and we AFFIRM the denial of Relator's discovery motions raised in Relator's brief on appeal.