EDITH H. JONES, Circuit Judge:
Laura S., a Mexican citizen, was in the United States illegally when U.S. Customs and Border Protection ("CBP") agents detained her near Pharr, Texas. In CBP custody, Laura signed a form indicating her decision to repatriate voluntarily. Laura was killed shortly after returning to Mexico. In this lawsuit, Laura's representatives seek damages under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) against Ramiro Garza, a CBP agent, and his supervisor, Ruben Garcia, for coercing Laura into signing the voluntary removal form, thereby denying her due process and causing her death.
The district court granted summary judgment for both defendants. For two independent reasons, we affirm the district court's judgment: (1) "special factors" preclude the extension of a Bivens remedy to this "new context" and (2) the defendants were entitled to qualified immunity.
BACKGROUND
I. Detention and Removal
In June 2009, Laura was driving with three friends near Pharr around 2:00 a.m.
*781 Local police stopped the car for a driving infraction. A police officer asked for proof of citizenship or immigration status. One of the passengers had a visa, but Laura and two of her friends, Arturo Morales and Saray Cardiel, had no documentation. The police officer notified CBP.
Laura allegedly began to weep and told the officer that Sergio, her ex-boyfriend and the father of two of her children, would hurt her if she returned to Mexico. Sergio had abused and threatened to kill her, and Laura had obtained a protective order against him in McAllen, Texas, though the order had expired in June 2008. Sergio had returned to Mexico and allegedly worked for a drug cartel.
The police officer released Laura, Morales, and Cardiel to CBP Agent Ramiro Garza, who drove them to a CBP processing center in Weslaco. Cardiel testified that Laura wept and told Agent Garza that she feared returning to Mexico because of Sergio.[1]
At the processing center, Agent Garza and another unknown CBP agent fingerprinted and interviewed Laura and Cardiel. Cardiel and Laura were not restrained or handcuffed and were not physically forced to do anything. The officers did not threaten them. Agent Garza had removed his handgun before entering the processing room, but he and the other officers on the floor each retained a taser and a baton.
Cardiel and Morales testified that Laura explained her fears about returning to Mexico and that she was crying and frightened. Cardiel also testified that the CBP agents said they were in a hurry. Laura was able to call her children's grandmother to make "suitable arrangements for [their] care and well-being." Laura asked for an opportunity to get the expired protective order to show the agents and asked to be released. The agents allegedly ignored her comments or laughed and told Laura and Cardiel "in high volume voices" that they had to go back to Mexico.
The agents presented Laura with Form I-826. This form included a "Notice of Rights" in Spanish. The notice stated:
You have been arrested because immigration officers believe that you are illegally in the United States. You have the right to a hearing before the Immigration Court to determine whether you may remain in the United States. If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date. In the alternative, you may request to return to your country as soon as possible, without a hearing.
You have the right to contact an attorney or other legal representative to represent you at your hearing, or to answer any questions regarding your legal rights in the United States. Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee. You have the right to communicate with the consular or diplomatic officers from your country. You may use a telephone to call a lawyer, other legal representative, or consular officer at any time prior to your departure from the United States.
Below this language, the form included a section titled "Request for Disposition." This section offered a list of three options from which an alien must choose:
1. "I request a hearing before the Immigration Court to determine *782 whether or not I may remain in the United States."
2. "I believe I face harm if I return to my country. My case will be referred to the Immigration Court for a hearing."
3. "I admit that I am in the United States illegally, and I believe I do not face harm if I return to my country. I give up my right to a hearing before the Immigration Court. I wish to return to my country as soon as arrangements can be made to effect my departure. I understand that I may be held in detention until my departure."
Next to each option was a check-box with an adjacent line for the alien's initials.
Cardiel testified that Laura initially refused to sign the form. The agents allegedly pointed at the form with their fingers and told her she had to sign. Laura eventually wrote an "X" in the check-box for the third option and wrote her initials there. This affirmed her selection of the voluntary return option.[2] Cardiel also selected the voluntary return option, testifying that she felt she "had no choice" because she "didn't want to be locked in because [she had] children."
Agent Ruben Garcia was the supervisor at the Weslaco facility when Laura was processed. He worked in the "Bubble," a glass tower in the middle of, and overlooking, the processing floor. As supervisor, he ultimately signed Laura's Record of Deportable/Inadmissible Alien form. The plaintiffs claim that the unidentified officer involved in Laura's processing must have been Agent Garcia because standard procedures required requests for assistance to go to the supervisor. Cardiel testified that Agent Garza briefly went into the Bubble, but there was no evidence of communication between Agent Garza and Agent Garcia. Cardiel did not identify Agent Garcia from a photograph.
After all three aliens had elected voluntary return, Agent Garza placed them in a van and drove them to the international Hidalgo-Reynosa Bridge to cross over into Mexico. Cardiel claims that Laura told Agent Garza, "If I am killed, you will carry that in your conscience."
In Mexico, Cardiel accompanied Laura to her grandmother's house. Later in the day, Laura asked Cardiel if there was someone to take her back to the United States because Sergio was looking for her. At some point after this conversation, Cardiel swam the Rio Grande to return to her children in the United States. Laura was murdered by Sergio several days later.[3]
II. Proceedings Below
Laura's mother, Maria S., filed a Bivens action as the next friend of Laura's three surviving minor children, seeking to recover damages from the immigration officers who participated in Laura's removal. Agents Garza and Garcia were ultimately named as the defendants. The defendants *783 filed a motion to dismiss, asserting five separate grounds, including the absence of a Bivens cause of action and qualified immunity. The district court denied the motion to dismiss.
Following limited discovery, the defendants moved for summary judgment. The district court granted summary judgement for both defendants. The district court granted summary judgment for Agent Garcia on the basis of qualified immunity and on the merits because the plaintiffs failed to create a fact issue as to whether he acted in any capacity other than a supervisory role at the CBP processing center. Regarding Agent Garza, the court held that the plaintiffs failed to create a fact issue as to whether he actually coerced Laura into selecting the voluntary return option on Form I-826.
The plaintiffs timely appealed.
JURISDICTION AND STANDARD OF REVIEW
A district court's grant of summary judgment is reviewed de novo , applying the same standards as the district court. Castellanos-Contreras v. Decatur Hotels, LLC , 622 F.3d 393, 397 (5th Cir. 2010) (en banc). The court views all evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Bolton v. City of Dallas , 472 F.3d 261, 263 (5th Cir. 2006).
This court reviews the grant of qualified immunity de novo . Brown v. Miller , 519 F.3d 231, 236 (5th Cir. 2008). "Our jurisdiction over qualified immunity appeals extends to 'elements of the asserted cause of action' that are 'directly implicated by the defense of qualified immunity[,]' including whether to recognize new Bivens claims." De La Paz v. Coy , 786 F.3d 367, 371 (5th Cir. 2015) (quoting Wilkie v. Robbins, 551 U.S. 537, 549 n.4, 127 S.Ct. 2588, 2597, 168 L.Ed.2d 389 (2007) (quoting Hartman v. Moore, 547 U.S. 250, 257 n.5, 126 S.Ct. 1695, 1702, 164 L.Ed.2d 441 (2006) ) ).
DISCUSSION
I. Bivens
The district court granted summary judgment on the issue of qualified immunity, but the defendants prevail on an alternative basis: the plaintiffs lack an implied cause of action under Bivens . This court may affirm the district court on any grounds supported by the record and argued in the court below. Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc. , 123 F.3d 301, 307 (5th Cir. 1997). The defendants' motion to dismiss argued that the plaintiffs lacked a Bivens remedy, but the district court rejected this argument. The district court erred as a matter of law.
When the district court addressed the Bivens issue, it lacked the guidance of the Supreme Court's recent elucidation of Bivens in Ziglar v. Abbasi , --- U.S. ----, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017). Abbasi stressed that any extension of Bivens to new factual scenarios is now a " 'disfavored' judicial activity." 137 S.Ct. at 1857 (quoting Ashcroft v. Iqbal , 556 U.S. 662, 675, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) ). The district court also lacked the guidance of Hernandez v. Mesa , this court's en banc application of Abbasi . See 885 F.3d 811, 823 (5th Cir. 2018) (en banc) (denying a Bivens remedy in the context of a CBP agent's cross-border shooting of a Mexican citizen on Mexican soil). In fact, the district court's Bivens analysis relied in part on the original panel opinion in Hernandez , which extended Bivens and *784 which was repudiated by the en banc court.
As explained in Abassi and Hernandez , there is a two part inquiry for determining whether to allow a Bivens cause of action: (1) whether the instant case involves a "new context" that is distinct from prior Bivens cases and (2) whether any "special factors" preclude extending Bivens to this "new context." 885 F.3d at 816-18.
There is no question that this case involves a "new context," and the district court acknowledged as much. Under Abbasi , there is a "new context" whenever a "case is different in a meaningful way" from prior Bivens cases. 137 S.Ct. at 1859-61. Neither the Supreme Court nor this court has ever implied a Bivens cause of action for a claim that an alien's death in another country was caused by the deprivation of procedural due process by CBP agents in the United States. The context here is new. Accordingly, we turn to the question of whether this case involves any "special factors" that would preclude a Bivens remedy.
The "special factors" analysis works to safeguard the separation of powers by asking whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy." Abbasi , 137 S.Ct. at 1858. If any such reasons-"special factors"-do exist, then "courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." Id. (emphasis added). "Even before Abbasi clarified the 'special factors' inquiry, we agreed with our sister circuits that '[t]he only relevant threshold-that a factor "counsels hesitation"-is remarkably low.' " Hernandez , 885 F.3d at 823 (quoting De La Paz v. Coy , 786 F.3d 367, 378 (5th Cir. 2015) (quoting Arar v. Ashcroft , 585 F.3d 559, 574 (2d Cir. 2009) (en banc) ) ). The circumstances of this case exceed this "remarkably low" bar; there are several "special factors" that counsel against extending a Bivens remedy to this "new context."
The comprehensive federal regulations governing immigration and the removal process weigh against creating a damages remedy in this context. As this court held in De La Paz v. Coy , "[d]espite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement. The institutional silence speaks volumes and counsels strongly against judicial usurpation of the legislative function." 786 F.3d at 377. In De La Paz , we refused to extend a Bivens cause of action to claims of unlawful arrest brought against CBP agents by illegal aliens. Id . at 380. Here also the comprehensive administrative and remedial procedures of the Immigration and Nationality Act ("INA") counsel against judicially inventing rights in this area. Under the INA, individuals can challenge the constitutionality of their deportation proceedings and can often seek a stay of deportation or a grant of asylum. See, e.g., Olabanji v. I.N.S. , 973 F.2d 1232, 1234-35 (5th Cir. 1992). Thus, if individuals' rights are violated, they will generally have recourse under existing law.[4]
Relatedly, judicial meddling in immigration matters is particularly violative of separation-of-powers principles because *785 the Constitution gives the political branches "broad, undoubted power over the subject of immigration." Arizona v. United States , 567 U.S. 387, 394, 132 S.Ct. 2492, 2498, 183 L.Ed.2d 351 (2012). Again, as we explained in De La Paz , "[l]ack of institutional competence as well as a lack of constitutional authority counsel or demand hesitation by the judiciary in fostering litigation of this sort." 786 F.3d at 379. Intervening here would implicate "concerns that lie at the heart of the 'special factors' concept." Hernandez , 885 F.3d at 823.
Creating a damages remedy against CBP agents for any injuries allegedly tied to deprivations of procedural due process during deportation would also "yield a tidal wave of litigation." De La Paz , 786 F.3d at 379. One CBP supervisor testified in this case that roughly 95% of all aliens processed at the Weslaco facility choose "voluntary removal." If we were to extend a remedy in this case, any aliens selecting "voluntary removal" on Form I-826 could subsequently sue on the theory that CBP agents coerced their signatures. Many of these claims would involve a he-said-she-said scenario, making them difficult to dismiss on summary judgment and costly to litigate. The danger of such litigation would, in turn, likely force CBP to change policies and procedures, even to adopt excessive precautions to prevent potential liability. Whatever the effect of such changes, the crucial point is that the consideration of policy changes is "for the Congress, not the Judiciary, to undertake." Hernandez , 885 F.3d at 821 (quoting Abbasi , 137 S.Ct. at 1863 ).
In sum, the implications of extending a Bivens remedy to these circumstances counsel hesitation and so preclude the plaintiffs' cause of action.
II. Qualified Immunity
Although the Bivens determination disposes of this case, we also hold that the district court correctly determined that both CBP agents were entitled to qualified immunity. The qualified immunity analysis has two prongs: (1) whether the facts, taken in the light most favorable to the plaintiffs, demonstrate that an officer violated a federal right and (2) whether the right was clearly established at the time of the violation. See District of Columbia v. Wesby , --- U.S. ----, 138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018). In denying the defendants' motion to dismiss, the district court held that Laura's right to procedural due process in immigration proceedings was clearly established at the time of the violation. Then, on summary judgment, the district court held that the plaintiffs had failed to raise a genuine issue of material fact as to whether this clearly established right was violated.
As to Agent Garcia, there is no need for further analysis because, as the district court found, there is no genuine issue of material fact that he was involved, from his supervisory perch, in any of the proceedings concerning Laura.
As to Agent Garza, however, we need not address the district court's determination that "clearly established" procedural due process law applied to his conduct when he obtained a consent form signed by Laura S. before her voluntary return. The court granted qualified immunity on the basis that the plaintiffs were unable to proffer evidence creating a genuine issue of material fact as to the objective unreasonableness of the agent's conduct or whether Laura was coerced into signing the form. The "relevant question," as Justice Scalia put it in Anderson v. Creighton, "is the objective (albeit fact-specific) question whether a reasonable officer could have believed" his conduct to be lawful in light of clearly established law and the information the officer possessed.
*786 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).
The district court conducted an exceptionally thorough review of the relevant facts surrounding the detention of Laura S. and found no indication of coercion or inherently unreasonable conduct by Agent Garza. Laura S. and her companion were detained at the standard immigration detention facility in Weslaco, Texas, for about 20-30 minutes. No officer brandished a firearm or weapon at them. She was not handcuffed. Laura S. was familiar with procedures because she had been voluntarily removed to Mexico twice before. Laura S. was literate in Spanish, and the form plainly offered her (in Spanish) the opportunity to remain detained while pursuing formal immigration proceedings. That she was fearful of her husband in Mexico was an extraneous fact not within the control of the officers. She was not overtly coerced. Any impression of the motives of Laura S. in signing a voluntary departure form is necessarily speculation without her testimony, and she could have had several reasons for her ultimate decision-including a swift departure over the border followed by a swift, stealthy re-entry into the United States.
The only evidence of alleged "coercion" found by the district court consisted of the complaints that Agent Garza "mock[ed]" and laughed at Laura S.; pointed "firmly" at the deportation form "in a strong manner;" told her in a loud voice to sign the form; and said she "had to go back to Mexico." But we, like the district court, find this histrionic conduct, even if true, insufficient, without more, to raise a genuine, material fact issue of coercion by Agent Garza. The agent's conduct was not objectively unreasonable. The district court correctly awarded qualified immunity.
For the foregoing reasons, we AFFIRM the district court's grant of qualified immunity.

Agent Garza does not recall being told this. He testified that Laura, Cardiel, and Morales were generally complacent. According to Agent Garza, had Laura told him that she feared returning to Mexico, she would have been given a hearing before an immigration judge.

"Voluntary return" is a term of art for "administrative voluntary departure," a process whereby an alien can leave the country without formal removal proceedings. See 8 U.S.C. § 1229c(a)(1).

Before her death, Laura allegedly told a cousin that the CBP agents had "kicked [her] out." The district court discarded the cousin's testimony as hearsay following a thorough analysis. The plaintiffs' opening brief states in a footnote that the district court erred in this conclusion but provides no explanatory analysis or supporting authority. Accordingly, the plaintiffs have waived any challenge on the hearsay issue. See N.W. Enterprises, Inc. v. City of Houston , 352 F.3d 162, 183 n.24 (5th Cir. 2003) ; Fed. R. App. P. 28(a)(9)(A) ; L&A Contracting Co. v. S. Concrete Servs. , 17 F.3d 106, 113 (5th Cir. 1994) (waiver for failing to cite authority).

The district court distinguished De La Paz in large part because the INA's procedures and remedies offer the plaintiffs no "redress for the death of their mother." But, as this court stressed in Hernandez , although the existence of a damages remedy usually precludes a Bivens extension, the "lack of a damages remedy [does not] favor extending Bivens ." 885 F.3d at 821.