# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 28, 2020

Lyle W. Cayce
Clerk

No. 19-50818

UNITED STATES OF AMERICA, ex rel., INTEGRA MED ANALYTICS,
L.L.C.,

　　　　Plaintiff–Appellant,

v.

BAYLOR SCOTT & WHITE HEALTH; BAYLOR UNIVERSITY MEDICAL
CENTER–DALLAS; HILLCREST BAPTIST MEDICAL CENTER; SCOTT &
WHITE HOSPITAL–ROUND ROCK; SCOTT & WHITE MEMORIAL
HOSPITAL TEMPLE,

　　　　Defendants–Appellees.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:17-CV-886

Before OWEN, Chief Judge, and HIGGINBOTHAM and WILLETT, Circuit
Judges.

PER CURIAM:*

　　Integra Med Analytics, L.L.C., filed a qui tam suit[1] on behalf of the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

[1] At the federal level, qui tam suits are those that are filed "for the person and for the
United States Government" and "brought in the name of the Government." 31 U.S.C.

No. 19-50818

United States against Baylor Scott & White Health system and its affiliates under the False Claims Act for allegedly using inflated codes to bill Medicare. The district court dismissed Integra Med's claims. We affirm.

**I**

The Baylor Scott & White Health system and its affiliates (Baylor) operate a network consisting of around twenty inpatient short-term acute care hospitals in Texas. A significant number of patients served by Baylor are covered by Medicare. Thus, Baylor regularly submits reimbursement claims to Medicare. In this case, Integra Med Analytics, L.L.C. (Integra Med) alleges that Baylor submitted $61.8 million in fraudulent claims to Medicare, in violation of the False Claims Act (FCA).[2]

Medicare reimburses hospitals like Baylor on a per-discharge basis, which means Baylor gets paid each time a patient stays at the hospital. The exact amount that Medicare reimburses primarily depends on a hospital's diagnoses of Medicare-covered patients. Medicare classifies similar diagnoses by putting them into a diagnosis related group (DRG). Each DRG is determined by several kinds of codes, including the principal diagnosis code and secondary diagnosis codes. The principal diagnosis code is for the "condition established after study to be chiefly responsible for occasioning the admission of the patient to the hospital for care."[3] Secondary diagnosis codes are for "all conditions that coexist at the time of admission, that develop subsequently, or that affect the treatment received and/or length of stay."[4]

---

§ 3730(b)(1). Thus, in qui tam suits, the government is the real party in interest. *United States v. Tex. Tech Univ.*, 171 F.3d 279, 289 (5th Cir. 1999).

[2] 31 U.S.C. § 3729.

[3] *See* Centers for Disease Control, *ICD-9-CM Official Guidelines for Coding and Reporting*, Oct. 1, 2011 at 88, available at https://goo.gl/DC55Wx.

[4] *See* Centers for Disease Control, *ICD-9-CM Official Guidelines for Coding and Reporting*, Oct. 1, 2011 at 91, available at https://goo.gl/DC55Wx.

Reimbursement can also be affected, to a lesser extent, by other hospital-specific factors, such as market conditions in the hospital's city.

Integra Med's allegations specifically concern Baylor's use of secondary diagnosis codes. The Centers for Medicare and Medicaid Services (CMS) publishes a list of secondary codes each year that can modify a claim to include a complication or comorbidity (CC) or a major complication or comorbidity (MCC). The inclusion of CCs and MCCs can add thousands of dollars to a Medicare reimbursement claim. Integra Med alleges that Baylor, led by its clinical documentation improvement (CDI) program, fraudulently used higher-value CCs and MCCs than were justified by actual medical diagnoses to increase its revenues. Integra Med contends that Baylor's scheme had three main components.

First, Integra Med contends that Baylor trained its physicians and CDI employees to "upcode" MCCs. According to Integra Med, Baylor trained its physicians to focus on key words, provided lists of high-value MCCs to physicians to reinforce that training, and emphasized that using certain terms would increase their performance pay. Integra Med also contends that Baylor had its CDI employees seek opportunities to use higher-value secondary codes.

Second, Integra Med alleges that Baylor pressured physicians to alter their original diagnoses by providing documents and asking them to "specify" or change their diagnosis if the diagnosis did not include CCs or MCCs. According to Integra Med, these clarification documents that requested physicians to "specify" their diagnoses would often "suggest either specific revenue-increasing CCs or MCCs or provide options listing several possible CCs and MCCs." Integra Med contends these clarification documents "reveal a clear intent towards influencing doctors to code higher-paying CCs and MCCs."

Third, Integra Med alleges that Baylor provided unnecessary treatment

in order to code high-value MCCs. Specifically, Integra Med contends that "Baylor purposefully placed and kept post-operative patients on ventilator support" when it was medically unnecessary. Integra Med bases this allegation on the fact "that Baylor patients undergoing major heart surgery were placed on mechanical ventilation [at rates] over twice the national average."

Integra Med analyzed inpatient claims data for the 2011-2017 period from CMS to discover that Baylor had been claiming certain MCCs significantly above the national average for other hospitals. Specifically, Integra Med found that Baylor coded for the MCCs of encephalopathy, respiratory failure, and severe malnutrition at much higher rates than other hospitals. Integra Med contends that its statistical analyses show that Baylor's higher rate of coding cannot be explained by patient characteristics, county demographic data, the patient's attending physician, or regional differences. According to Integra Med, its "analyses prove that the excessive rates of [certain] MCCs can be directly attributed to [Baylor's] fraudulent activity as opposed to external factors, indicating that the fraud was known by the system and was intentional."

Besides statistical data, Integra Med also relied on several statements from a former Baylor medical coder in concluding that Baylor had defrauded Medicare. According to Integra Med, this medical coder recalled a then-Baylor executive "telling CDIs things that were totally not true" as a part of a "deliberate effort to promote the coding of MCCs." This medical coder also allegedly received specific instructions on how to code. Integra Med claims that this medical coder quit her job with Baylor because she was unable to work where she "was continually getting directives to compromise her integrity." Integra Med also relied on certain statements about increasing hospital revenues from a former Baylor executive's social media.

No. 19-50818

Based on these statistics and statements, Integra Med sued Baylor under the FCA in federal district court in April 2018. After Integra Med amended its complaint twice, Baylor moved under Federal Rule of Civil Procedure Rule 12(b)(6) to dismiss Integra Med's complaint. The district court granted Baylor's motion to dismiss, holding that Integra Med's complaint failed to state a particularized claim for which relief could be granted as required by Federal Rules of Civil Procedure 8(a) and 9(b). This appeal followed.

## II

To survive a motion to dismiss an FCA claim, Integra Med must plead the following four elements: (1) "a false statement or fraudulent course of conduct;" (2) that was "made or carried out with the requisite scienter;" (3) "that was material;" and (4) "that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."[5] Integra Med's case on appeal hinges on whether Integra Med sufficiently pleaded facts showing that Baylor's claims were fraudulent. Thus, we will examine each of Integra Med's bases for its claims, including its statistical data generally, the documents it has gathered from Baylor, statements by a former Baylor medical coder, and the claim that Baylor provided unnecessary medical care to boost its Medicare reimbursements.

## A

We first examine the statistical data presented by Integra Med, reviewing whether it sufficiently shows that Baylor's Medicare reimbursement claims were fraudulent. "[A] complaint filed under the False Claims Act must

---

[5] *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)).

meet the heightened pleading standard of Rule of 9(b)."[6] Federal Rule of Civil Procedure 9(b) provides, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."[7] Although the particularity Rule 9(b) demands "differs with the facts of each case,"[8] it does generally require that a complaint detail "the who, what, when, and where . . . before access to the discovery process is granted."[9] Rule 9(b)'s particularity requirement supplements Rule 8(a)'s demand that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[10] Rule 8(a) prohibits any claims that are merely conceivable rather than plausible.[11] A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and "obvious alternative explanation."[12]

Here, Integra Med's statistical analysis is consistent with both Baylor having submitted fraudulent Medicare reimbursement claims to the government and with Baylor being ahead of most healthcare providers in following new guidelines from CMS. In 2007, CMS reduced the standardized amount paid out to hospitals for Medicare reimbursement claims but increased the number of secondary diagnoses identified as CCs and MCCs, and coding

---

[6] *See, e.g., United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (first citing *United States ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308-09 (5th Cir. 1999), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009); and then citing *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004), *abrogated on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008)).

[7] FED. R. CIV. P. 9(b); *see also Kanneganti*, 565 F.3d at 185-86.

[8] *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)).

[9] *Id.* (alteration in original) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)).

[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kanneganti*, 565 F.3d at 185.

[11] *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

[12] *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567).

more CCs and MCCs can increase hospital reimbursements.[13]  In response to public comments expressing concern that the new rules would lead to lower reimbursements, CMS stated that it expected reimbursements to increase under the system.[14]  CMS believed it was "clear" that hospitals would "change their documentation and coding practices and increase case mix consistent with the payment incentives that are provided by the" then new coding system.[15]  In fact, CMS encouraged hospitals to adopt CDI programs "in order to increase reimbursement" and highlighted an article touting the effectiveness of CDI programs at increasing Medicare reimbursement rates.[16] CMS unequivocally stated in its guidelines that, "[w]e do not believe there is anything inappropriate, unethical or otherwise wrong with hospitals taking full advantage of coding opportunities to maximize Medicare payment that is supported by documentation in the medical record."[17]

The conclusion that Baylor was simply ahead of the healthcare industry in following CMS guidelines is supported by the data in Integra Med's own complaint.  Integra Med's complaint shows that the rate at which non-Baylor hospitals were using the MCCs for encephalopathy, respiratory failure, and severe malnutrition was increasing every year.  These increases were causing the MCC usage rates of both Baylor and non-Baylor hospitals to converge. Moreover, for severe malnutrition, non-Baylor hospitals were coding it at a higher rate in 2017 than Baylor was in 2015.  Similarly, for respiratory failure, non-Baylor hospitals were coding it at a higher rate in 2017 than Baylor was

---

[13] *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates*, 72 Fed. Reg. 47,130, 47,135-39 (Aug. 22, 2007) (final rule).

[14] *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates*, 72 Fed. Reg. at 47,180-82.

[15] *Id.* at 47,182.

[16] *Id.*

[17] *Id.* at 47,180.

in 2011. These show that the healthcare industry as a whole was following Baylor in its trajectory and by 2017, other hospitals' coding was within a few percentage points of Baylor's.

These facts strongly indicate that a legal and "obvious alternative explanation" for the statistical data presented by Integra Med is that Baylor was simply ahead of the healthcare industry at implementing the Medicare reimbursement guidelines supplied by CMS.[18] We note that this conclusion does not exclude statistical data from being used to meet the pleading requirements of Federal Rule of Civil Procedure 8(a) and, when paired with particular details, Rule 9(b).[19] Our conclusion merely means that statistical data cannot meet those pleading requirements if, among other possible issues, it is also consistent with a legal and obvious alternative explanation.[20]

Insofar as Integra Med purports to give specific examples of fraudulent claims, it also fails to meet the pleading requirements of Rules 8(a) and 9(b). Integra Med's examples simply give some identifying patient information and pair it with a diagnosis. No example gives any indication about what makes it a false claim. The claims of falsity are simply conclusory.[21]

---

[18] *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

[19] *See, e.g.*, *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 247-48, 258 (3d Cir. 2016) (concluding, in the Rule 8(a) and 9(b) context, that statistical data about the lack of markings on a company's pipe fittings was sufficient to state an FCA claim for avoiding import duties when paired with an expert's declaration analyzing the facts of that case, specific examples of unmarked pipes with photographs, a witness statement about receiving improperly marked pipes, and detailed records about the shipments at issue); *Boykin v. Georgia-Pac. Corp.*, 706 F.2d 1384, 1390-94 (5th Cir. 1983) (concluding, in the Rule 8(a) context, that plaintiff's presentation of statistical data successfully stated a prima facie case of racial discrimination).

[20] *See Iqbal*, 556 U.S. at 678.

[21] *See Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (quoting *S. Christian Leadership Conference v. Supreme Court of the State of La.*, 252 F.3d 781, 786 (5th Cir. 2001))).

No. 19-50818

**B**

**1**

We next examine whether Integra Med's allegations that Baylor trained and pressured its physicians and CDI employees to "upcode" MCCs are sufficient to establish that Baylor was engaging in a scheme to submit fraudulent claims to Medicare. We conclude that they are not. In publishing the new DRG coding rules, CMS explicitly expected hospitals to work with their physicians and medical coders, including through training, to "focus on understanding the impact of the revised CC list."[22] According to Integra Med, Baylor trained physicians to focus on keywords, provided tip sheets reminding physicians of how to report high-value MCCs, had CDI employees look for opportunities where high-value MCCs might be present, and would sometimes send physicians documents asking them to clarify their diagnoses. Integra Med argues that these practices show Baylor was involved in a scheme to defraud Medicare. But CMS encouraged hospitals to employ practices like these after it implemented the new DRG rules.[23] Far from a fraudulent scheme, Baylor's implementation of such practices is entirely consistent with the new DRG rules.[24]

For example, Baylor's use of tip sheets is consistent with the fact that coding and clinic terminology are often different. Tip sheets help hospitals align the two. Likewise, non-leading documents asking physicians to clarify their diagnoses are also consistent with implementing the new DRG rules since

---

[22] *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates*, 72 Fed. Reg. at 47,182 ("[H]ospitals may focus on understanding the impact of the revised CC list, training and educating their coders, and working with their physicians for any documentation improvements required to allow the reporting of more specific codes where applicable.").

[23] *See id.*

[24] *Id.*

No. 19-50818

the new DRG rules moved hospitals away from focusing on general diagnoses and codes to frequently using more specific diagnoses and codes.[25]  Physicians were likely still accustomed to the old, more general system.   These clarification documents had numerous suggestions, a simple box to check to decline clarification, and a disclaimer not to take implications from the fact clarification was asked for.  Additionally, some of the clarification documents provided by Integra Med in its complaint show that clarification was requested in instances in which physicians wrote down symptoms but failed to provide a diagnosis for the cause of those symptoms.  These clarification documents also did not ask leading questions.  Considering diagnoses are critical for Medicare reimbursements and these specific clarification documents were not leading, they are consistent with Baylor engaging in legal activity.

Therefore, we conclude that these allegations are also consistent with a legal and "obvious alternative explanation."[26]

**2**

In its complaint, Integra Med also cites the statements of a medical coder who said that a then-Baylor executive told "CDIs things that were totally not true" as a part of a "deliberate effort to promote the coding of MCCs." According to Integra Med, this medical coder said she was given specific instructions on how to code, and that medical coders "receive[d] pressure directly from . . . leadership to code unethically."  This medical coder also allegedly quit her job because she "was continually getting directives to compromise her integrity."  But these allegations fail to satisfy the heightened pleading standards required by Federal Rule of Civil Procedure 9(b) because they fail to state the content of these allegedly unethical and fraudulent

---

[25] *See id.* at 47,130-82 (Aug. 22, 2007) (final rule).

[26] *See Ashcroft v. Iqbal,* 556 U.S. 662, 682 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 567 (2007)).

directives, trainings, and guidance.[27]    Thus, the district court correctly dismissed the claim based on these conclusory allegations.

## C

We next look at Integra Med's allegations that Baylor provided unnecessary treatment to patients in order to use higher-value MCCs. Specifically, Integra Med contends that "Baylor purposefully placed and kept post-operative patients on ventilator support" when it was medically unnecessary. The allegations here are based solely on the fact "that Baylor patients undergoing major heart surgery were placed on mechanical ventilation over twice the national average." These allegations do not withstand the heightened pleading requirements for fraud under Rule 9(b).

Integra Med fails to plead particular details of a scheme to defraud Medicare. Even when plaintiffs in an FCA case use statistics, which can be reliable indicia of fraud, they must still plead particular details of a fraudulent scheme for each claim.[28] Here, Integra Med's complaint contains a conclusory

---

[27] *See Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000) (concluding that to meet the pleading requirements of Rule 9(b) a complaint must state "the who, what, when, and where" of a claim. (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997))). Integra Med claims that the situation here is "strikingly similar" to the situation in *United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019). We disagree. In *Creative Solutions*, the employee witness interviews actually revealed the contents of a specific fraudulent scheme. *Id.* at *4. That opinion notes, "a physical therapist at Fairfield recalled being instructed to allot 15 minutes for evaluation, even though it required 45 minutes, with the rest of the evaluation session charged at therapy rates." *Id.* (internal quotation omitted). The interview responses given by Integra Med here, while alleging a vague scheme to "promote the coding of MCCs," do not provide the who, what, when, and where of such scheme as required by Rule 9(b). The vague allegation here contrasts with the *Creative Solutions* interview responses, which included the requisite particularity and specificity.

[28] *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."); *see also United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013) ("We established that a relator could, in some

allegation that Baylor was providing unnecessary treatment to its patients and supports it with a single statistic—that Baylor patients undergoing major heart surgery were put on a mechanical ventilator at a rate over twice the national average. Integra Med does not present sufficient particular details of this alleged fraud claim. The district court correctly dismissed the FCA claim based on Integra Med's allegation that Baylor provided unnecessary treatment to patients to increase its Medicare reimbursements.

In conclusion, Integra Med has failed to meet its pleading requirements under Rules 8(a) and 9(b). The district court did not, as Integra Med contends, view the complaint in the light most favorable to Baylor—it simply correctly held Integra Med to the higher pleading standard required for an FCA claim.

### III

Integra Med contends that the district court improperly held its allegations to a more rigorous scienter requirement than was required by the FCA. But we need not address scienter because the district court correctly dismissed Integra Med's claims for failing to meet the pleading requirements required by Rules 8(a) and 9(b) for pleading the FCA's element that there be "a false statement or fraudulent course of conduct."[29]

Integra Med also contends that the district court improperly applied a probability standard at the pleadings stage instead of a plausibility standard. But regardless of whether the district court mistakenly applied a probability

---

circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to each false claim. This standard nonetheless requires the relator to provide other reliable indications of fraud and to plead a level of detail that demonstrates that an alleged scheme likely resulted in bills submitted for government payment." (emphasis and citations omitted)).

[29] *United States ex rel King v. Solvay Pharm., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009)).

standard rather than a plausibility standard, our conclusion is the same.[30] Since "[we] may affirm the district court on any grounds supported by the record and argued in the court below," any misapplication that might have occurred here would not require us to vacate or reverse the district court's judgment.[31]

*     *     *

For these reasons, the district court's judgment is AFFIRMED.

---

[30] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007))).

[31] *Maria S. ex rel. E.H.F. v. Garza*, 912 F.3d 778, 783 (5th Cir. 2019) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 307 (5th Cir. 1997)).